Muse, J.
On September 21, 2000, the Massachusetts Civil Service Commission (“the Commission”) found the decision of the plaintiff, the City of Cambridge (“the City”), to suspend police officer Gerald Gurry (“Gurry”) for 30 days to be unsupported by the evidence presented. The Commission ordered that Gurry be reinstated without loss of compensation or other rights. The City now seeks judicial review of the administrative proceedings pursuant to G.L.c. 30A, §14 and c. 31, §44. Both the City and Gurry have moved for judgment on the pleadings. After a hearing, a review of the parties’ memoranda and portions of the administrative record, and based on the following reasons, the City’s motion is DENIED and Guriy’s motion is ALLOWED. As a result, the Commission’s decision dated September 21, 2000 is hereby AFFIRMED and the City’s decision to suspend Gurry is VACATED.

STATEMENT OF FACTS

The facts, as found by the Commission, are as follows. Officer Gurry has served on the Cambridge Police Department since 1974.[2] Relevant to this case are two Dunkin Donuts stores, known as the Alewife and Concord Avenue stores, respectively. Both stores are in Cambridge. The Alewife store was solely owned *492 by Mr. Vincent Leo (“Leo”) and the Concord Avenue store was co-owned by Leo, Mr. Lyle Morrison (“Morrison”), and his wife. Gurry and Ms. Sharon Smith (“Smith”) met in 1992, when Gurry investigated the robbery of the Alewife store, where Smith was the night manager. Since then, the two had a platonic friend.ship. Gurry often visited with Smith and Mr. Vache Alavachian (“Alavachian”), an employee, at the Concord Avenue store during the store’s night shift. Gurry would check up on them, and Smith and Alavachian appreciated Gurry’s concern. Both Leo and Morrison were aware that Guriy visited while both on and off duty, and they appreciated the police presence in the store, even when Gurry (and on occasion other officers) were in the store after it was closed to the public.
On December 21, 1994, Gurry worked the 12:00 a.m. to 8:00 a.m. shift and was assigned to the East Cambridge patrol sector. Shortly after roll call, Gurry radioed Sergeant Theodore Carlin (“Sgt. Carlin”), requesting clearance to leave his sector to travel to North Cambridge to pick up some Christmas presents. Officer requests to temporarily leave their sector are regularly approved and are within the standard operating procedure of the Cambridge Police Department. Sgt. Carlin granted Gurry’s request and at approximately 2:30 a.m., Gurry arrived at the Concord Avenue store. The regular hours of the store are 5:00 a.m. to 11:00 p.m., with the drive-through window being open twenty-four hours a day. Gurry was allowed into the store through the employee’s rear entrance by Alavachian, who has known Gurry for seven years. The two have attended social functions together and Gurry once helped Alavachian register his car. While in the store, Alavachian allowed Gurry to take two pounds of coffee grinds and two decorative containers, on the condition that Guriy returned the next day to pay for them. Alavachian allowed Gurry to go behind the counter to help himself, but Gurry needed assistance to operate the coffee grinder. Although unknown to Gurry, it was Dunkin Donuts’ policy to never allow customers behind the counter or to leave the store without paying for items taken. Ten minutes after filling the containers with the coffee, Guriy radioed Sgt. Carlin and returned to his assigned sector to continue his patrol.
Later on December 21, Morrison became upset upon seeing Gurry’s actions on the videotape of the night before. After going to a Christmas party, Morrison returned to the Concord Avenue store to discuss the prior night with Smith and Alavachian. It was approximately 11:30 p.m. and prior to that time, Morrison had drunk five beers. Alavachian explained to Morrison how he gave permission to Gurry to take the items and also assisted him in grinding the coffee. He also mentioned how Gurry promised to return to pay for what he had taken. Upon learning this information, Morrison called the Cambridge Police Department and left a message for Gurry to call Morrison, claiming that it was an emergency. Because Gurry was off duty, he did not receive the message at the time, and Morrison left the Concord Avenue store at approximately 1:00 a.m. The next day, Guriy was assigned to the 4:00 p.m. to 12:00 a.m. shift, where he received Morrison’s message of the night before. After his shift, Gurry returned to the Concord Avenue store and paid for the coffee and containers in full. At approximately 4:00 p.m. on December 22, 1994, Morrison apprised Leo of the situation and Leo watched the videotape. Morrison neglected to tell Leo that Gurry had permission from Smith and Alavachian nor did he tell Leo that Guriy later paid for the items. Although Leo never discussed the matter with his employees, he called the Cambridge Police Department and asked the desk sergeant to tell all of the officers that they were not allowed to go behind the counter at the two Dunkin Donuts stores. At the next roll call, this message was announced to all of the officers present by Sergeant Doherty.
Pursuant to the information supplied by Morrison and Leo, the Cambridge Police Department began an investigation, which was conducted by Sergeant David Betz (“Sgt. Betz”) of the Internal Affairs Division. After completion, the City suspended Gurry for five days, which was later increased to thirty days. The internal investigation found three violations:
a) [Gurry] violated Chapter 2, Section 1, conflict of interest in that [he] secured unwarranted privileges or exemptions for [himself] or gave the appearance of such action by entering a Dunkin Donuts store after hours, through an entrance not available to the public, helping oneself to goods of the store without paying for them at the time, and
b) pursued a course of conduct which raised suspicion among the public that [he] was engaged in acts that were in violation of [his] trust, by acting in a way, as described above, which made it appear to the minority owner of the store and others viewing the security tape that [he was] helping [himself] to store goods in a way not available to members of the public, and
c) failed to avoid all activities not relating directly to [his] police responsibilities during duty hours, in that [he was] absent from [his] assigned patrol area (at the end of the City) for between forty-five minutes and an hour to pursue a purchase and socializing that should have been done on [his] own time. This absence was without timely notice to [his] supervisor or dispatch center of [his] whereabouts and without describing these activities on [his] daily log.
Although the notice further states that there is “sufficient evidence to establish that [Gurry] committed a misdemeanor,” no charges were ever brought against Gurry for acquiring the goods without compensating the owners. On August 14, 1996, Gurry appealed this decision to the Civil Service Commission and the case has remained on appeal ever since.

*493
DISCUSSION

G.L.c. 31, §44 grants any person or entity who is aggrieved by a decision of the Civil Service Commission, in a judicial review of administrative proceedings, the right to appeal the decision to the Superior Court, subject to G.L.c. 30A, §14. This Court may reverse the Commission’s judgment “if it determines that the substantial rights of any party may have been prejudiced because the agency decision is . . . (e) unsupported by substantial evidence; or ... (g) arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.” G.L.c. 30A, §14(7); City of Cambridge v. Civil Service Commission, 43 Mass.App.Ct. 300 (1997). When reviewing the administrative appeal, “the court shall give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.” G.L.c. 30A, §14(7).
Pursuant to G.L.c. 31, §2(b), the proper legal standard the Commission must apply is “whether, on the basis of the evidence before it, the appointing authority has sustained its burden of proving that there was a reasonable justification for the action taken by the appointing authority.” City of Cambridge, 43 Mass.App. at 303. During an administrative appeal, a reasonable justification is defined as “done upon adequate reasons sufficiently supported by credible evidence, when weighed by an unprejudiced mind, guided by common sense and correct rules of law.” Id. at 304. In the present case, the Commission found that the City did not sustain its burden by proving that it had a reasonable justification for Gurry’s suspension.
The City first argues that the Commission’s finding that Gurry was allowed into the store because he was a friend of Alavachian and not because he was a police officer is not supported by substantial evidence. This attack is based on the Commission’s holding that “Alavachian credibly testified” to his friendship with Gurry being the motivation for his special treatment of Gurry. (Magistrate’s Recommended Decision,, at 10.) Although plausible, the City has failed to offer sufficient proof to substantiate its contention. Initially, the phrase cited by the City is contained within the “Conclusion” section of the Magistrate’s Recommended Decision. It is nowhere contained within the section labeled “Findings of Fact.” (Magistrate’s Recommended Decision, at 2-9.) Furthermore, Finding #21 of the Recommended Decision describes the relationship between Gurry and Alavachian. The Magistrate found that the two men had “been friends for almost seven years. [Gurry] helped Alavachian register his car and they have attended social events together.” (Magistrate’s Recommended Decision, pg. 4.) The Magistrate cited to both Alavachian’s and Gurry’s testimony in making these findings. It appears from the hearing transcript that Alavachian was often confused and contradictory during his own testimony, often misunderstanding the questions presented to him. The determination of credibility of witnesses, and the resolution of conflicts between witnesses testimony, were squarely within the province of the fact finder, and in the circumstances of this case, should not be disturbed.
The city asserted that Gurry deserved a suspension because his behavior “left the impression that [he was] being granted privileges not available to the general public.” (Letter from the City of Cambridge to Gerald Gurry dated August 9, 1996, at 2; Magistrate’s Recommended Decision, at 8.) In other words, it is alleged that Gurry’s actions created an “appearance of impropriety.” Neither the Commission nor the Magistrate specifically referred to this charge in their decisions. The Magistrate did conclude, however, that the City “failed to sustain its burden of proving reasonable justification for suspending [Guriy]” and “failed to show that [Gurry’s] actions violated any public trust.” (Magistrate’s Recommended Decision at 10.) For the purposes of this appeal, this Court will assume that the Commission, in adopting these findings, found that there was no appearance of impropriety.
This Court’s task is to determine whether the Commission’s finding that Guriy’s actions did not create an appearance of impropriety was based on substantial evidence. What constitutes such an improper appearance is neither defined in the civil service statutes, nor was a definition supplied by the parties. In searching for a definition, this Court could find no workable framework in the decisions of the Commission, either before or after this case arose, and there is little case law on point. However, there are decisions of the State Ethics Commission on point, and this Court finds them to be persuasive authority. The Ethics Commission’s decisions concern the interpretation of G.L.c. 268A, §23(b)(3), the public employee and official’s code of conduct, which contains an appearance of impropriety clause.[3] The standard set forth by the Ethics Commission focuses on the perceptions of the official’s actions in the eyes of the citizens in the community and not of those involved in the situation. In the Matter of Hebert, 1996 State Ethics Comm’n 800, 810 (April 29, 1996). More precisely, the test asks whether in the eyes of a reasonable person with knowledge of the relevant circumstances, there is an appearance of a conflict of interest or the acceptance of unwarranted privileges. State Ethics Commission, A Practical Guide to the Conflict of Interest Law for Police Officers, at 10-12 (1989); Scaccia v. State Ethics Comm’n, 431 Mass. 351, 359 (2000) (quoting Hebert, supra). Such an appearance arises when it looks as if “the integrity of the public official’s action might be undermined by the relationship or interest.” Hebert, supra, at 810.
Here, the Commission’s findings that there was no appearance of impropriety is supportable by substantial evidence. A reasonable person, being a citizen in *494 the community at large, with knowledge of the relevant circumstances, could conclude that there was no impropriety in Guriy’s conduct that night. It is not disputed that Gurry asked Alavachian to tender payment for the items taken the following day and that Gurry did, in fact, pay Alavachian after Guny’s shift the next day. It is also undisputed that Morrison and Leo were not aware of all of the circumstances regarding the transaction when they saw the video of Gurry and Alavachian. Hence, their reactions to the video are not indicative as to what a member of the general public with complete knowledge of the facts would have been. Furthermore, although in the Hebert case the long-term friendship between the official and the other actors was seen as a detriment, the Commission here was free to find that the personal relationship between Alavachian and Guriy would have worked to dispel an appearance of impropriety in the public. This is because in Hebert, the official, who was a building inspector, had taken official actions affecting his friends while accepting assistance from them in his personal matters. In this case, there is no intimation that Gurry took any official action “in matters affecting his friend.” Hebert, supra, at 811. Finally, it is undisputed that Alavachian did not realize that his actions that night were in violation of Dunkin Donuts policy. This fact could lead one to the inference that any member of the public, who was trusted to the same extent as Gurry, would have been able to arrange to pay for the items the next day, just as Gurry was. Accordingly, this Court finds that substantial evidence exists that could support a finding that no conflict of interest and no appearance of impropriety was created by Gurry’s actions on the night of December 21, 1994, and that violations (a) and (b) were not proven.
The Commission’s rejection of the charge that Gurry violated departmental rules by failing to avoid all activities unrelated to his police responsibilities during working hours is supported by substantial evidence. It is established and undisputed that there was a standard operating procedure in the Cambridge Police Department to allow officers to temporarily leave their sector for personal reasons. Accordingly, the Commission based its findings with regards to this charge [violation (c)] on substantial evidence and the Court will not disturb it.

ORDER

For the foregoing reasons, the plaintiff City of Cambridge’s Motion for Judgment on the Pleadings is DENIED and the defendant Gerald Guny’s Motion for Judgment on the Pleadings is hereby ALLOWED.

Over the course of his career, Guriy received numerous commendations for his work, but also a one-day suspension, three written warnings, and one oral warning.

In fact, police officers such as Gurry are within the purview of the statue, however, the present case arises out of the City’s own policies and not c. 268A, §23.